## 10393. COLUMBUS POWER COMPANY *v.* PUCKETT.

JENKINS, J. 1. An electric company which, after the erection of a telegraph company's line, erects and maintains over and across the line of telegraph wires, or in close proximity thereto, a high-tension wire which carries a dangerous current of electricity is bound to exercise ordinary diligence in the erection and maintenance of its poles and wires, so as to permit an employee of the telegraph company, who ascends a pole of his company in the discharge of his regular duties, to perform his work in reasonable safety; and an employee of the telegraph company, while in the exercise of ordinary care for his own protection, has the right to assume that such high-tension wires are properly placed and insulated so as to render them reasonably safe. See Ridgeway *v.* Sayre Electric Co., Ann. Cas. 1918D, 4, and notes (258 Pa. 400, 102 Atl. 123, L. R. A. 1918A, 991), for a full discussion of the law applicable to this case. See also *Atlanta Consol. St. Ry. Co.* v. *Owings,* 97 *Ga.* 663 (25 S. E. 377, 33 L. R. A. 798) ; *City of Dawson* v. *Smith,* 18 *Ga. App.* 603 (90 S. E. 76) ; *Trammell* v. *Columbus Railroad Co.,* 9 *Ga. App.* 98 (70 S. E. 892).

2. Where one, especially one who is experienced in his business, has the choice of two ways of doing a given piece of work, the one safe and the other dangerous, he is under a duty to select the former; and if, instead of so doing, he voluntarily selects the latter, when he knows or ought in the exercise of due care on his part to know of the danger, he is guilty of a lack of ordinary care (*Columbus Railroad Co.* v. *Dorsey,* 119 *Ga.* 363, 366, 46 S. E. 635; *Southern Cotton Oil Co.* v. *Skipper,* 125 *Ga.* 368 (5), 54 S. E. 110) ; but under the facts alleged in the petition in this case, it was for the jury to determine, from the evidence, whether there were two ways, one safe and the other dangerous, in which the plaintiff could have performed the work in which he was engaged, and if so, whether he voluntarily selected the dangerous way with actual or imputable knowledge of the danger incident to doing the work in that way.

3. While it is true that if the plaintiff could, by ordinary care, have avoided the consequences to himself caused by the defendant's negligence, he is not entitled to recover (Civil Code of 1910, § 4426), still questions as to diligence and negligence, including contributory negligence, are questions peculiarly for the jury, and the court will decline to solve them by decision on demurrer, except in plain and indisputable cases. *Southern Cotton Oil Co.* v. *Gladman,* 1 *Ga. App.* 259 (8), 260 (58 S. E. 249) ; *International Cotton Mills* v. *Webb,* 22 *Ga. App.* 309 (4), 310 (96 S. E. 16). Applying these principles of law to the

petition in this case, it can not be said that the facts disclosed show, as a matter of law, that no other legal conclusion could be reached than that the plaintiff was guilty of a lack of ordinary care, or was injured by reason of his own negligence. So long as it can reasonably be said that fair-minded men might disagree upon these questions, the propriety of the plaintiff's conduct under all the circumstances alleged is a question for determination by the jury, and not by the court.

4. The plaintiff having originally brought his action jointly against his master, the telegraph company, and the defendant electric company, and having subsequently by amendment stricken the telegraph company as a party defendant, the doctrine known as the "master and servant rule" is not involved. Thus, after the plaintiff had alleged that he did not know and could not by the exercise of ordinary care have discovered the danger to which he was exposed, the further allegations as contained in paragraphs 35, 36, 37 and 38 of the amendment, to the effect that the plaintiff did not know and had no opportunity of knowing that his *master* had furnished to him an unsafe place to work, and that he did not have equal means with his master of knowing or discovering that the place was dangerous, or of knowing or discovering that the place had been rendered dangerous in which to work, were immaterial and irrelevant to the issues involved, and the special demurrer should for this reason have been sustained. Otherwise the petition as amended, construed as a whole, was not subject to the demurrers interposed, and the court did not err in so holding.

5. The facts presented in the cases of *Columbus Railroad Co.* v. *Dorsey*, 119 *Ga.* 363 (46 S. E. 635), *Dorsey* v. *Columbus Railroad Co.*, 121 *Ga.* 697 (49 S. E. 698), and *Zachery* v. *Mayor &c. of Madison*, 18 *Ga. App.* 490 (89 S. E. 594), while in some respects similar, are distinguishable from those alleged in the present petition, and the rulings there made are not in conflict with what is here decided. Some of the distinguishing features are pointed out in the case of *City of Dawson* v. *Smith*, supra. In this case it is alleged that the danger existing by reason of defective insulation was in fact unknown to the petitioner, and after inspection from the ground could not be ascertained, and was not discoverable by him while climbing the pole. This court can not say, as a matter of law, that the defects as described in the petition were patent. It is also alleged in this case, while it does not appear in the cases just cited, that certain rules were of force requiring that the high-tension wire of the defendant should be placed at a specified safe distance from the underlying telegraph wires, and that an inspection of the same, as made by the plaintiff, would and did fail to disclose their dangerous proximity. We are not prepared to say, as a matter of law, that this allegation is necessarily untrue.

*Judgment affirmed in part and reversed in part, with direction that the costs be taxed against the plaintiff in error. Stephens and Smith, JJ., concur.*

DECIDED NOVEMBER 6, 1919.

Action for damages; from Muscogee superior court—Judge Howard. February 10, 1919.

James G. Puckett sued the Postal Telegraph-Cable Company and the Columbus Power Company jointly for damages on account of personal injuries. Subsequently he amended his petition by striking from it the Postal Telegraph-Cable Company as a defendant. The allegations of the petition as amended are substantially as follows: On or about December 13, 1916, at about four o'clock in the afternoon, petitioner, while in the employ of the Postal Telegraph-Cable Company as a lineman and engaged about its business, was injured as hereinafter set forth. M. C. Welch was at that time employed by the telegraph company as district foreman of maintenance of lines for the States of Georgia and Florida, and had general supervision and direction of petitioner as well as of the other employees of the telegraph company while engaged in its work; and the petitioner, with Jonah Puckett, D. Harrison, and two negro laborers whose names the petitioner does not know, were working under the supervision and control of said district foreman, taking down certain wires of the telegraph company suspended on poles running along Front street near the Georgia end of the lower concrete bridge in the city of Columbus, which spans the Chattahoochee river. In obedience to a command of the said Welch, the petitioner had climbed a pole of the telegraph company, about 50 feet high, at the intersection of Ninth and Front streets, and as he reached the cross-arms of the telegraph wires at the top of the pole he was seized by an electric current of approximately 11,000 volts, which drew him across the double cross-arms at the top of the pole and along and over a span of wires of the telegraph company, with his left foot and leg near or against a high-powered wire of the defendant, which was carrying 11,000 volts of electricity, and with his right arm, between the elbow and the shoulder, resting on one wire and his left hand on another wire of the telegraph company; and in this position, lying on his back across the telegraph wires, with his left leg near or in actual contact with said high-powered wire and the bottom of his right foot against one of said wires, he lay for some fifteen minutes, with the current of 11,000 volts of electricity passing through his body and limbs; and he lay in this position until the arrival of an officer who had been telephoned that he was caught in said current, and until the officer could telephone to the power plant of the defendant to cut off the current. This required about

fifteen minutes. In the meantime the petitioner, as he lay on said wires, was being burned with the high-voltage current passing through his body.

It is further alleged: At the time the petitioner was injured the high-powered wire of the defendant crossed over and above the telegraph company's wires, which the petitioner had gone up the pole to cut down, about three feet north of the telegraph pole. The high-powered wire which carried 11,000 volts of electricity was suspended only five and a quarter inches above the telegraph wires. Petitioner and the other employees mentioned above were engaged in cutting down the telegraph wires and removing a "lead" of telegraph wires and poles from the west side of Front street to near the curb on Front street, so as to comply with the requirements of a city ordinance. The number of volts carried by said high-powered wire was not known to him. The telegraph wires were ordinarily charged with only a light current of electricity and were harmless. Several weeks before the injury the telegraph company was notified that this high-powered wire was so close to its wires as to render their position unsafe and make dangerous the place at the top of the telegraph pole for the telegraph company's employees. During the morning of the day on which petitioner was injured, until about ten o'clock, employees of the defendant were at work on the high-powered line and poles bearing said line. The telegraph company's wires "were fastened to double-arms at the top of the telegraph pole, to arms on either side of the . . pole, with the . . telegraph wires fastened to insulators on both arms." The telegraph wires and line had been standing at this point for about ten years, and the high-powered wires of the defendant had been suspended by it over the telegraph wires for about three years. The high-powered wire had been placed by the defendant dangerously near (that is to say five and a quarter inches above) the telegraph wires, and had remained in this condition for about three years. Petitioner was a stranger in the city of Columbus, and had been at work in Columbus not quite two days when he was injured.

It is further alleged, that the petitioner before climbing the pole made the usual examination of the pole and the wires, that is to say he examined visually from the ground the pole, cross-arms thereon, and wires at and near its top, and the relative

height of the poles on either side of the telegraph pole on which the high-powered wires were strung; and from its foot the pole and cross-arms appeared to be safe, and the wires of both the telegraph company and the defendant appeared to be properly spaced, and, having no reason to apprehend that the high-powered wire was improperly spaced from the telegraph wires, he proceeded to climb the pole for the purpose of cutting down the wires. After he had ascended the pole some seven or eight feet he called out to a negro helper (whose name he does not know) to throw a rope to him, and as the negro threw the rope the petitioner reached out with both hands and caught it. He can not remember drawing his body back to the pole or placing his hands on the pole again, and from that moment until he regained consciousness in the hospital many days thereafter he suffered (on account of the injury) a complete lapse of memory, and his mind is still blank as to everything that occurred from the moment he caught the rope until he regained consciousness in the hospital. After he caught the rope he proceeded to climb on up towards the top of the pole in the performance of his duties, and when he came in contact with the telegraph wires at the top of the pole, which were ordinarily charged with a light current of electricity and harmless, he was seized by a current of 11,000 volts of electricity which was being transmitted from the high-powered wire to the telegraph wires.

It is further alleged: Where said wires crossed there were some twenty-odd wires, some of which were on the telegraph pole and the remainder of which were resting on the high-powered poles standing on either side of and adjacent to the high telegraph pole. The wires attached to the high-powered pole crossed the telegraph wires about at right angles, and the crossing of the wires was about midway between the two poles of the high-powered line. Several weeks before petitioner was injured the defendant was notified that its high-powered wire was so close to the telegraph wires as to render their position unsafe and make dangerous the place at the top of the telegraph pole for the telegraph company's employees to work. Unknown to petitioner at the time he climbed the pole, the high-powered wire was so near the telegraph wires that, in swinging, a current of electricity intermittently flowed from it to the telegraph wires at the top of the pole. On that occasion

the telegraph company ordered him to go to the top of said tele-
graph pole to cut down its telegraph wires; and the defendant
had actual knowledge of the dangerous condition of said wires
and their proximity each to the other, and of said wires to the
top of the pole, several weeks before he was assigned to the
work of cutting down the telegraph wires. As he climbed up
said pole to and against the telegraph wires his back was to the
high-powered wire, and for this reason he could not and did not
see that wire, and did not and could not know of its close proximity
to the telegraph wires and their dangerous position. In order for
him to climb said pole it was necessary to use spurs, fastened to his
feet and lower legs, and to stick the spurs into the pole by jabbing
or kicking them, thereby supporting the weight of his body. As
he climbed it was necessary to pull the spurs out of the pole and
jab them higher, and thus, with his hands around the pole and
his eyes on his feet and on the pole, to select suitable and safe
places to stick his spurs, as his duties required him to do, he
performed the difficult task of climbing to the top of the pole, up
to and against the telegraph wires, with his back to the high-
powered wire, not knowing or having any opportunity to know
of the proximity of said telegraph wires to the high-powered
wires, or their unsafe position and condition. The telegraph pole
was crooked and twisted, and had what is commonly known among
linemen as a belly and a back. Petitioner climbed its back, which
was the usual, ordinary, and safe way of climbing the pole, it
being unsafe and insecure to climb the belly of the pole, for,
among other reasons, the spurs worn on the linemen's feet were
liable to slip out of the belly of the pole and precipitate the line-
man to the ground. Petitioner, while climbing the back of the
pole, climbed between the telegraph wires on the north side of the
pole. It was the duty of the defendant to warn him that the
high-powered wire was dangerously near to the telegraph wires
which he was ordered and required to cut down. The rules of the
telegraph company, which were known to the defendant, required
that no high-powered wire should be strung and maintained at a
distance of less than 42 inches above its telegraph wires, and the
defendant, through its agents and employees, knew that said wires
were approximately only five and a quarter inches apart, and had
been in that close proximity for several weeks or months before
the petitioner was injured.

It is alleged in paragraphs 36 to 38, that the petitioner did not know and had no opportunity of knowing that he was encountering any danger in going to the top of the telegraph pole to cut down the wires; that he did not know and had no opportunity of knowing that his master, the telegraph company, had furnished to him an unsafe place to work, and he did not have equal means with his master of knowing or discovering that the place was dangerous, or of knowing or discovering that it had been rendered dangerous as a place in which to work. It is alleged that he did not know and had no means or opportunity of knowing of the unsafe proximity of said high-powered wire to the telegraph wires, and at the time aforesaid his attention was directed to the difficult work of climbing the pole; that he did not see and had no opportunity of seeing or discovering the unsafe proximity of the high-powered wire to the telegraph wires, and it was not discoverable by him while he was engaged about his duties as aforesaid; that he climbed the pole in the line of his duties, he being then in the exercise of all reasonable and ordinary care and diligence, to discharge the labors he had been ordered to do, apprehending no danger whatever.

It is further alleged: The defendant was negligent in that when said high-powered line was originally constructed the high-powered wires were placed within a closer distance to the telegraph wires than 42 inches, and it allowed its high-powered wire gradually, during the three years, to sag until it had come within five and a quarter inches of said telegraph wires. The defendant knew or in the exercise of ordinary care and diligence should have known that its high-powered wire, being suspended within five and a quarter inches above the telegraph wires, rendered the telegraph wires dangerous, and also made dangerous the wires attached to the telegraph pole, and made them dangerous to the telegraph company's men who chanced to work on said wires. He did not see the high-powered wire sagging down, for the reason that his attention was directed to the work of climbing the pole, and it was not discoverable by him while he was engaged about his duties. It was no part of his duty to inspect said wires to ascertain their relation to each other. He climbed to the top of said pole as he had been ordered to do, assuming, as he had a right to do, that it and its wires were in a safe condition; and he had never climbed or been on said telegraph pole before. It was

the duty of the defendant from time to time to inspect said wires, which it negligently failed to do, and to see to it that said wires were not placed or allowed to sag dangerously near the telegraph wires, so as to protect the employees of the telegraph company from harm while they were engaged about their duties of working on the telegraph pole and wires. The defendant knew at the time it strung its wire only five and a quarter inches from the telegraph wires that it would be necessary for the employees of the telegraph company to ascend said pole to keep its wires, cross-arms, and insulators in repair, as well as to string new wires and take down old wires. The defendant knew that the employees of the telegraph company were engaged in taking down the telegraph wires on the day on which the petitioner was injured, and that while so engaged they would be exposed to the danger of the said current of 11,000 volts being transmitted from the high-powered wire to the telegraph wires and from the telegraph wires to the bodies of the telegraph company's employees. The defendant was further negligent in that it failed to warn petitioner of the unsafe condition of said wires, and permitted him, although the employees of the defendant knew that the wire had sagged down and thereby made it extremely dangerous, to go to the top of the pole for the purpose of cutting down the wires, without warning him of their dangerous condition.

It is further alleged: The double cross-arms on the telegraph pole were fastened to it about seven or eight inches from its top, and were about eight feet long, and supported three wires on either side of the pole, and each of these wires was fastened to a pair of insulators on the double cross-arms. In order to get in a position to cut down the telegraph wires it was necessary for petitioner to climb up between the wires next to the pole, and while he was climbing between them, with his back to the high-powered wire, he received the electric shock and was injured. The defendant owed to the employees of the telegraph company the duty to have its high-powered wire properly and efficiently insulated, and, failing in this, to place that wire a sufficient distance—not less than 42 inches—away from and above the telegraph wires, so as to prevent the telegraph wires from coming in contact with the high-powered wire, as well as protect the telegraph company's employees against danger from its high-powered current while they were

in the performance of their duties at or near the top of the tele-
graph pole.  The high-powered wire was an insulated wire, and
the defendant was negligent in that at the point where the current
was transmitted from its high-powered line to the telegraph wires
the insulation on the high-powered line was defective "and in two
places was blistered or swollen so as to permit and did permit,
while petitioner was climbing up between said telegraph wires at
or near the top of said pole with his back toward the high-powered
wire, as a result of the telegraph wires shaking and swinging or
being caught on the clothes or tools of petitioner and raised so
that they, the telegraph wires came close enough to the said high-
powered wire for the current to arc from the said high-powered
wire at the point of the defective insulation thereon to the tele-
graph wires and thence into petitioner's body, injuring him as
stated;" which defects in the insulation were unknown to peti-
tioner and not discoverable or discernable by him from the ground
or from the telegraph pole upon which he was at work.  The
defects in the insulation were latent and were not discoverable
by petitioner while he was engaged in the performance of his
work.  The defendant was negligent in that it allowed the insula-
tion on its high-powered wire to become defective as aforesaid.  It
is alleged that the petitioner was in the exercise of all ordinary
care and diligence at the time of the injury.  Allegations are made
as to the nature and extent of the damage to the plaintiff.

The defendant demurred, on the grounds that no cause of action
was set out; that the facts alleged show that the petitioner, by
the exercise of ordinary care, could have avoided the alleged
injuries; that if the high-powered wire was in unsafe proximity to
the wires of the telegraph company, the petitioner, by the exercise
of ordinary care, could have known of the danger before he was
injured; that it does not appear from the facts alleged that the
negligence of the defendant was the proximate cause of the injuries,
and that it appears that they were caused by his own negligence.
Other grounds of demurrer were:  that it is not alleged that the
high-powered wire ever came in contact with the wires of the
telegraph company, as a result of the negligence of the defendant;
that it is not alleged that the petitioner made any effort to discover
the distance the high-powered wire was from the wires of the tele-
graph company after he had started to ascend the pole, and no

fact is alleged to show that he could not see the alleged unsafe proximity of the wires to each other by the exercise of ordinary care; that the allegations that he exercised ordinary care in performing his duties, or in ascending the pole which he did ascend, are merely conclusions of the pleader, and no facts are alleged to show that he exercised such care; that it does not appear, from the facts alleged, that any act of negligence on the part of defendant was the proximate cause of the injury to the plaintiff; that no facts are alleged to show how he "was seized" by a current of electricity, and the allegations that he was so "seized" are too indefinite to enable the defendant to make its defense. The part of the petition in which it is alleged that the high-powered wire was so near the wires of the telegraph company as that, in swinging, a current of electricity intermittently flowed from that wire to the telegraph wires was demurred to, upon the grounds: (*a*) It is not alleged how near the high-powered wire was to the telegraph wire. (*b*) The said allegation is too indefinite. (*c*) The said allegation is a mere conclusion of the pleader and does not sufficiently set forth facts as to the distance apart of the wires of the two companies. The allegations that the plaintiff could not see the high-powered wire, and could not know of its close proximity to the telegraph wires and their dangerous position, were demurred to, upon the grounds: (*a*) No facts are alleged to show why petitioner could not see the high-powered wire and why he could not know of its close proximity to the telegraph wires and their dangerous position. (*b*) The said allegations are mere conclusions of the pleader. Paragraph 31 of the amendment to the petition, which alleged that "petitioner climbed said pole in the usual and ordinary and safe way," was demurred to, upon the grounds: (*a*) It is not alleged what was the usual, ordinary, and safe way of climbing the telegraph pole. (*b*) The said allegations are mere conclusions of the pleader and do not set forth facts specifically enough to enable the defendant to make its defense. (In paragraphs 46 and 47 it is alleged: "The telegraph pole was crooked and twisted and had what is commonly known among linemen as a belly and a back. Petitioner climbed the back of the pole, which was the usual, ordinary and safe way of climbing the pole, it being unsafe and insecure to climb the belly of the pole.") That part of paragraph 34 of the amendment to the petition wherein

it is alleged that "petitioner did not know and had no opportunity of knowing that he was encountering any danger in going to the top of said telegraph pole to cut down said wires" was demurred to upon the grounds: (*a*) No facts are alleged to show why he had no such opportunity. (*b*) The said allegation is a mere conclusion of the pleader. Paragraphs 35, 36, 37, and 38 of the amendment to the petition, which alleged that the plaintiff did not know and had no opportunity of knowing that his master had furnished to him an unsafe place to work, that he did not have equal means with his master of knowing or discovering that the place was dangerous, or of knowing or discovering that the place had been rendered dangerous as a place of work, were demurred to upon the ground that the said paragraphs are immaterial, irrelevant, and surplusage. The defendant demurred further upon the grounds, that no facts are alleged to show why the plaintiff did not or could not discover the defective insulation; that it does not, from any facts alleged, appear why the defects were latent, and it does appear that the defects were not latent; that it appeared that the plaintiff had the choice of two ways of doing the work which he was endeavoring to do when injured, the one safe and the other dangerous, and that instead of doing it in the safe way he voluntarily selected the unsafe way, when he knew or ought to have known of the danger.

The court overruled the demurrers, and the defendant excepted.

*Frank U. Garrard, A. S. Bradley, A. W. Cozart,* for plaintiff in error.

*Atkinson & Born, Ed. Wohlwender,* contra.